IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RANDY L. MOON,<br><br>      Plaintiff,<br><br>v.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>      Defendant. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:04 CV 1149 DN<br><br>Magistrate Judge David Nuffer |

This case was referred to the Magistrate Judge, with the consent of the parties, to conduct all proceedings pursuant to 28 U.S.C. § 636(c). Plaintiff Randy L. Moon, seeks judicial review, pursuant to 42 U.S.C. § 405(g), of the decision of the Commissioner of Social Security denying his claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Plaintiff claims that he is disabled under 12.05 C or D of the Listing of Impairments. This order, however, affirms the decision of the Commissioner.

**Table of Contents**

Procedural History ............................................................................................. 1

Mr. Moon's Background ...................................................................................... 1

Early Evaluation History ..................................................................................... 2

Medical History ................................................................................................... 5

Last Evaluation – Dr. Gummow ......................................................................... 8

Hearing Testimony ............................................................................................. 13

Framework for Analysis ..................................................................................... 17

**Plaintiff's Arguments** ....................................................................................... 20

    Deficiency in Findings ................................................................................. 20

    Legal Error ................................................................................................... 21

    Listing 12.05 C ............................................................................................. 22

    Dr. Gummow's Report ................................................................................. 23

    Listing 12.05 D ............................................................................................. 25

    Summary of Step 3 Analysis ........................................................................ 26

**Conclusion** ........................................................................................................ 28

**Procedural History**

Plaintiff Randy L. Moon filed an initial application for Supplemental Security Income benefits under Title XVI of the Social Security Act alleging disability since July 2001.[1]  Mr. Moon was denied at the initial level on December 13, 2001, and at reconsideration on April 18, 2002.[2]  Mr. Moon filed a "good cause for late filing" hearing request through his Department of Workforce Services Employment Counselor, which was accepted by an Administrative Law Judge ("ALJ") on November 6, 2002.[3]  Mr. Moon appeared at a hearing held on October 20, 2003 and received an unfavorable decision from ALJ Henrie on December 5, 2003.[4]  A timely request for review by the Appeals Council was filed December 15, 2003.[5]  The final administrative action by the Commissioner of Social Security denying Mr. Moon's request for review was issued by the Appeals Council on October 29, 2004.[6]

**Mr. Moon's Background**

Mr. Moon was thirty-five years old at the time of the hearing.  He was born in Burley, Idaho on September 2, 1968.  He is a Native American and a member of the Goshute tribe.  He has lived his life primarily in the towns of Wendover and Grantsville, near the Goshute reservation in Tooele County, Utah.  Mr. Moon has a limited education.  He was placed in special education classes throughout his school years, and completed only the ninth grade at Dugway High School.[7]  He has not earned a GED.[8]  Mr. Moon has engaged in part-time employment, working through temp agencies at construction sites and as a dishwasher.[9]  He has

---

[1] R. 70-73.
[2] R. 35, 42.
[3] R. 31, 34.
[4] R. 12.
[5] R. 10.
[6] R. 4-7.
[7] R. 109, 139.
[8] R. 262.
[9] R. 104, 112-14.

never engaged in work at a level defined under federal law as Substantial Gainful Activity[10] ("SGA").

### Early Evaluation History

Mr. Moon's evaluation history begins before his filing date.  His caseworker at the Utah Department of Workforce Services took him to Valley Mental Health, after many unproductive attempts to get Mr. Moon employed.[11]

On June 27, 2001, Liz McGil, Ph.D., the Program Manager at Valley Mental Health, administered a Wechsler Adult Intelligence Scale-Third Edition to Plaintiff.  Dr. McGil noted that Plaintiff seemed cooperative and appeared to put forth his best effort.  Plaintiff demonstrated a verbal IQ of 67, a performance IQ of 80, and a full-scale IQ of 81, indicating borderline intellectual functioning with a learning disability.  Dr. McGil noted Plaintiff had a flat affect, but Plaintiff denied depression and Dr. McGil saw no need for treatment or intervention.  Dr. McGil considered Plaintiff's "major problem" in a workplace would be his slowness in comprehending and executing tasks.[12]

After this claim was filed, on March 22, 2002, Jonathan J. Ririe, Ph.D., performed a psychological evaluation of Plaintiff for the State Disability Determination Services (DDS).[13] Plaintiff reported his father dropped him off for the evaluation and that he planned to take a bus home.  He also reported his social worker directed him to apply for social security because he had not worked in a couple of years.  Plaintiff reported that he last worked as an assembler three or four years prior to the evaluation, but survived by finding places to work here and there and was "paid under the table."[14]

---

[10] 20 C.F.R. § 220.29.
[11] R. 294-295.
[12] R. 131.
[13] R. 132.
[14] R. 133.

Plaintiff stated he needed no medication and took no medication for diabetes or any other impairment, even though he had trouble sleeping due to leg pain and trouble walking due to leg discomfort, and felt run down and tired.[15]  Plaintiff reported he raised his two children himself and typically woke up his children and got them ready for school; cleaned around the house; washed, folded, and put away clothes; and watched television.[16]  He attended to his hygiene daily, prepared meals, and shopped independently.  He also went to movies, to video arcades with his children, and to eat at cafes, and enjoyed swimming, fishing, bike riding, and playing basketball.[17]  Dr. Ririe noted that Plaintiff had borderline intellectual functioning and a learning disorder, finding a Full Scale IQ of 71, using a mental status exam, but found no obvious physical (no disturbance of gait, balance, or posture) or mental impairments (alert, oriented, socially appropriate, normal conversation and concentration).[18]  He noted that Plaintiff managed his finances independently with no significant difficulty.[19]

On March 23, 2002, Blair McGirk, M.D., performed a physical consultative examination of Plaintiff for the DDS.[20]  Plaintiff complained of diabetes, painful bones and vision problems.  "He has not seen a doctor in years."[21]  Plaintiff reported he could stand 15 to 20 minutes and walk as long as he wanted, and walked or took a bus everywhere.[22]  Plaintiff lived with his mother and two minor children (aged 10 and 11) and they shared cooking and cleaning chores.  He reported no difficulty with doing cooking and chores.[23]  He reported he took no medication, except for an occasional Tylenol for headaches.  Dr. McGirk found Plaintiff was "in no acute distress," alert, oriented, friendly, cheerful, and cooperative; had appropriate speech and affect,

---

[15] *Id.*
[16] R. 134, 135.
[17] R. 135.
[18] R. 136.
[19] R. 137.
[20] R. 138.
[21] *Id.*
[22] R. 138-39.
[23] R. 139.

and normal abilities to see, hear and speak; and sat comfortably.[24]  Plaintiff had normal range of spine and joint motion; normal strength, including grip strength; good bilateral dexterity; intact reflexes; normal sensation; and no symptoms with straight-leg-raising.[25]  Dr. McGirk found that Plaintiff's shins were tender to palpation, but he could walk, heel-toe walk, walk on his toes and heels, hop, squat, and bend and touch his toes without difficulty.  Dr. McGirk detected no diabetic retinopathy or neuropathy.[26]

On April 14, 2002, Rebecca Dalisay, M.D., a DDS physician, reviewed the medical evidence and completed a Psychiatric Review Technique form.[27]  Dr. Dalisay concluded Plaintiff had a learning disorder and borderline intellectual functioning, with a Full Scale IQ of 71.  She found mild restrictions in activities of daily living and social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  Dr. Dalisay also completed a Residual Functional Capacity Form[28] finding Plaintiff had:

*no significant limitations*

    understanding and remembering short and simple instructions and with social interaction;

    in adaptation, except for moderate limitations responding to changes in a work setting; and

    with sustained concentration and persistence for short and simple instructions.

*moderate limitations*

    maintaining attention and concentration for extended periods,

    performing activities within a schedule,

    maintaining regular attendance,

---

[24] *Id.*
[25] R. 140.
[26] *Id.*
[27] R. 155-68.
[28] R. 173-75.

being punctual within customary tolerances,

completing a normal workday and workweek without interruptions from
psychologically based symptoms; and

performing at a consistent pace without an unreasonable number and length of
rest periods.

### Medical History

Plaintiff's history of medical treatment begins post-filing.  He told one examiner that his
family did not have regular medical care,[29] and his Department of Workforce Services
caseworker testified she was the one to initiate his medical care.[30]  In August 2002, Plaintiff
sought treatment at Grantsville Medical Center, reporting he had "twisted [his] back two weeks
previously".[31]  Plaintiff was tender over the spinous process in the lower thoracic and upper
lumbar areas.  He was advised to see a back specialist and given a prescription for Lortab.  His
glucose level was 235 and his liver enzymes were elevated.[32]  He was given a prescription for
Glucophage and advised to follow up.[33]

In September 2002, during a follow-up visit, Plaintiff reported he had not worked in years
due to back pain with pain and numbness radiating to the lower extremities.[34]  "[H]e has a lot of
low back pain and pain radiating to his lower extremities.  He reports that the pain and numbness
become much worse with any lifting."  Benjamin J. Krogh, D.O., found Plaintiff was in no acute
distress.  He gave continued prescriptions for Glucophage and Lortab.[35]  He also completed a
"disability form."

---

[29] R. 222.
[30] R. 298-99.
[31] R. 213.
[32] R. 218.  It is not clear if any of the Plaintiff's glucose tests were "fasting," but all the results reported in the record
are far above expected ranges.  http://www.labtestsonline.org/understanding/analytes/glucose/test.html (last visited
March 29, 2006).
[33] R. 213, 218.
[34] R. 209.
[35] R. 209, 211.

In October 2002, Plaintiff presented to Dr. Krogh for a recheck.[36]  Plaintiff reported thirst, blurred vision, increased urination, and difficulty sleeping.[37]  Dr. Krogh noted increased paraspinal tissue tension and tenderness in the lumbar and thoracic areas, "some mild tenderness" over the sacroiliac joints, and "some decreased sensation to touch" over the left lower extremity.[38]  Dr. Krogh noted, "He reports problems with blurry vision, increased thirst. and increased urination. He complains of difficulty sleeping at night."[39]  Plaintiff had normal strength and negative straight-leg-raising.  Dr. Krogh prescribed Glucophage and reminded Plaintiff to take it every day.  He also prescribed Ambien and instructed Plaintiff on strategies to improve his sleep.  He prescribed Lortab and referred Plaintiff to an orthopedic specialist.[40]

In December 2002, B. Reynolds, M.D., of Grantsville Medical Center, saw Plaintiff for insomnia, bone and muscle pain in the thoracic, lumbar, and sacral areas, and the lower extremities.[41]  Dr. Reynolds reports Mr. Moon "[i]s having muscle and bone pain in lower legs and thoracic vertebrae, and lumbar/sacral.  Makes him cry at night.  When straightening up from bending the pain in his back takes his breath away."[42]  Plaintiff's glucose level was 397.[43]  His liver enzymes and hemoglobin were also elevated.  Dr. Reynolds noted low back muscle spasms and poorly controlled diabetes.[44]  Dr. Reynolds advised Plaintiff to increase Glucophage to "maximum therapy" and work hard on controlling the diabetes.[45]  Dr. Reynolds also prescribed Lortab.[46]

---

[36] R. 204.
[37] Id.
[38] Id.
[39] Id.
[40] R. 200-03.
[41] R. 199.
[42] Id.
[43] R. 216.
[44] R. 199.
[45] R. 199, 216.
[46] R. 195-97.

In March 2003, Plaintiff presented to Dr. Reynolds for a recheck of his diabetes and back.[47]  He had a normal musculoskeletal system.  Plaintiff's glucose level was 475.[48]  Dr. Reynolds advised Plaintiff to undergo diabetes education and prescribed new medication.

In May 2003, Dr. Krogh saw Plaintiff for sinusitis.[49]  Plaintiff reported Ambien worked well for insomnia, new medication controlled the diabetes better, and his vision had improved. Dr. Krogh reports, "He continues to have the pain in his legs from the diabetic neuropathy.  He continues to have some blurry vision, but reports that the vision is better."[50]  Diagnoses were given as "Sinusitis, diabetic neuropathy, Type II diabetes, insomnia."[51]  Dr. Krogh noted Plaintiff was alert, oriented, and in no acute distress.

Later in the month, Dr. Krogh again noted Plaintiff was alert, oriented, and in no acute distress, but had "some decreased sensation" over his toes and the balls of his feet.[52]  He diagnosed diabetic neuropathy and prescribed Lortab for neuropathic pain.

In July 2003, Plaintiff presented to Dr. Krogh for medication refills.[53]  Plaintiff reported that the medications worked "reasonably well" and adequately relieved his symptoms.  Dr. Krogh found Plaintiff was alert, oriented, and in no acute distress.  Dr. Krogh reports,

> He also complains that for the past 4 days he has had a headache.  He has had some blurry vision, photophobia and nausea.  He also complains of some numbness in his face and occasional numbness in his arms and legs.  He reports that he usually just has the numbness in just 1 arm, but it alternates between arms. He has had migraines in the past.[54]

Upon physical exam, Dr. Krogh notes:

---

[47] R. 193.
[48] R. 214.
[49] R. 184.
[50] *Id.*
[51] *Id.*
[52] R. 182.
[53] R. 178.
[54] *Id.*

> EYES:  Pupils are mid dilated and only minimally reactive. . . . NEUROLGICAL: There was little reactivity of the pupils as previously mentioned.  When the patient was asked to smile he was noted to have a slight facial droop on the left. When lightly touched on his cheeks with a finger he was able to sense this, but reported that the sensation was somewhat decreased. . . . Deep tendon reflexes were +114 and equal bilaterally of the upper and lower extremities.[55]

Diagnosis was, "Facial numbness, facial droop, allergies, insomnia, back pain, Type II diabetes."[56]  But he had intact grip strength and upper and lower extremity strength, sensation, and reflexes.  A brain CT scan revealed "mild mucosal thickening in a few of the left ethmoid air cells," but was otherwise normal.[57]

### Last Evaluation – Dr. Gummow

Shortly before the October 2003 hearing, on September 6, 2003, Mr. Moon underwent a comprehensive neuropsychological evaluation[58] arranged for and paid by the Utah State Department of Workforce Services.  The evaluation was conducted by Linda J. Gummow, Ph.D., who has extensive experience and training in neuroscience.[59]  This is the most comprehensive evaluation Mr. Moon has undergone.  The following twelve tests were administered:

Benton Visual Retention Test-Revised (Form C Administration A);

California Verbal Learning Test-2 (Short Form);

Cornplex Figure Test (Myers and Myers);

Finger Tapping Test;

Grip Strength;

Grooved Pegboard Test;

Memory Assessment Scale (immediate and delayed prose recall);

---

[55] *Id.*
[56] *Id.*
[57] R. 186.
[58] R. 220.
[59] Dr. Gummow's Curriculum Vitae is found at R. 122- 128.

Peabody Picture Vocabulary Test: (Arithmetic. Reading Recognition, Comprehension, Spelling);

Peabody Picture Vocabulary Test;

Symptom Checklist-90-Revised;

Test of Nonverbal Intelligence-3;

Wechsler Adult Intelligence Scale-I11 (Digit Symbol, Symbol Search); and

Wide Range Achievement Test-3 (Arithmetic).[60]

Plaintiff reported he had always been the primary care-giver for his children and continued to raise them after his wife's death.[61]  Plaintiff also reported that the only problem he ever had with working was in finding transportation.  He spoke only English.  He reported "feelings of depression," being "very down sometimes," and being unable to sleep due to anxiety.[62]  He stated both his parents had diabetes, but that his family did not seek medical care, so his own diabetes went untreated for a long time.[63]  He reported back, leg and arm pain; blurred vision; dizziness; headaches; memory lapses; and sleep issues.   Plaintiff told Dr. Gummow that he drove, cared for his personal needs, made his bed, vacuumed, walked for ten to twenty minutes at a time, did some yard work, and raked leaves.[64]  He also reported he could not identify monetary figures, perform simple math, shop without help, carry heavy grocery bags (more than ten pounds), cook without help, do laundry, clean without help, or push a lawn mower (due to arm and hand pain).

---

[60] *Id.*
[61] R. 221.
[62] R. 222.
[63] R. 223.
[64] R. 224.

Dr. Gummow administered the Test of Nonverbal Intelligence-3 explaining this is a *"culture fair" test of intelligence* that can be given to individuals of various ethnic backgrounds. Mr. Moon's IQ was scored at 64.  Dr. Gummow comments that his "true IQ is expected to lie in the range of 60 to 68."[65]

Dr. Gummow's *academic testing* placed Mr. Moon at the second and third grade levels (using standardized testing with the Peabody Individual Achievement Test (PIAT) and the Wide Range Achievement Test-3 (WRAT).  Dr. Gummow opines that Mr. Moon is "unable to track routine financial transactions in either an employment or personal situation," stating that, "Although he believes that he can determine if he is receiving correct change, it is unlikely that he can do so reliably."[66]  He was unable to read time on a clock face, tell the number of days in a week, or answer simple questions regarding money and change.  Dr. Gummow reports, "Mr. Moon is unable to read a restaurant menu, read many common signs, or read any form of contract. . . .  His learning difficulties are a reflection of global low cognitive functioning."[67]

Mr. Moon's *processing speed, coding skills and visual search skills* were tested through the Digit Symbol and Symbol Search subtests.   Dr. Gummow opines the results of these tests indicate that "Mr. Moon cannot process information at the level required by competitive employment."[68]

Mr. Moon's *memory skills* were evaluated with the Benton Visual Retention Test, California Verbal Learning Test-2, and the Memory Assessment Scale.  Mr. Moon tested at the 1st percentile for number correct, the 5th percentile for number of errors, the 9th percentile for

---

[65] R. 225.
[66] R. 226.
[67] R. 227.
[68] *Id.*

initial recall, dropping to the 5th percentile after a delay.  He scored at the 3.6[th] percentile on a list learning task.  Dr. Gummow opined that Mr. Moon's visuopractic skills, scoring at the 8th percentile, was "a relative strength" and was consistent with "his ability to drive under limited conditions."[69]

Dr. Gummow assesses Mr. Moon to be "significantly impaired" in his "ability to use his right dominant hand and left nondominant hand on both *strength and dexterity* measures."[70]  Dr. Gummow used Finger Tapping, Grip Strength, and Grooved Pegboard Tests.  Mr. Moon tested at .1 for the right hand and 1.7 for the left hand.  She reports, "his left nondominant hand use, while relatively uncoordinated and weak when compared to the general population, was significantly better than his dominant right hand use."[71]

Mr. Moon's "*receptive vocabular*y" was assessed with the "Peabody Picture Vocabulary Test," where his score was 53 or less than the 1st percentile.[72]

Dr. Gummow opines that a "standard *personality* test" could not be administered to Mr. Moon because of his cultural background and limited language skills.  She read to him the SCL-90-R symptom checklist, explaining symptoms as necessary.  Dr. Gummow reports the "Global Severity Index" was at the 99th percentile and states that individuals with this profile have significant psychiatric issues impacting their care.  Dr. Gummow opines, "These individuals are highly sensitive to emotional strains and stresses.  It is difficult for them to deal with criticism."[73]

---

[69] *Id.*
[70] R. 228.
[71] *Id.*
[72] R. 227.
[73] R. 228.

Dr. Gummow *diagnoses* Mr. Moon with a "Pervasive Developmental Disorder to indicate that Mr. Moon has significant cognitive and functional deficits of long standing, but the etiology of these deficits is unclear."[74]  Dr. Gummow also reports

> Mr. Moon's physical condition was poor.  He had significant pain in his upper extremities, and he complained of visual problems.  The examiner could not determine if the extremity pain was second to peripheral neuropathy.  This condition can be quite debilitating and it is more likely to be associated with diabetes that goes untreated for some time. This was clearly the case here.  Mr. Moon was literally wasting away until he finally sought medical care. . . .  He is easily overwhelmed.  He is afraid and his situation is unstable.  He is totally dependent on others. . . .  Depression is common among patients with diabetes. . . .  It is unclear whether the depression is a direct result of the impact of diabetes on the central nervous system, whether it is a reflection of the impact of the disease on the individual's life or whether both factors are important. . . .  If Social Security benefits are awarded.  Mr. Moon should have a payee to make sure that he is not exploited.[75]

Dr. Gummow provides "Psychiatric Impairment Ratings" for Mr. Moon.  She rates Mr. Moon with "*marked impairment in activities of daily living*."[76]  The doctor includes a summary of her testing and clinical observations in support of her rating:

> He needs assistance with shopping, meal planning, and meal preparation. . . .  He cannot take public transportation without assistance and support.  He cannot make sure his bills are paid, read significant correspondence, or manage a checking account.  He cannot keep a schedule without assistance.  He cannot do heavy activities such as carrying.[77]

---

[74] R. 229.
[75] R. 229.
[76] R. 230 (emphasis added).
[77] *Id.*

12

Dr. Gummow rates Mr. Moon as having a "*marked impairment in adaptation*," opining that his cognitive impairments impact his ability to adjust to changing circumstances.  "He is slow to learn and he has very limited visual and verbal memory skills."[78]

Dr. Gummow rates Mr. Moon with an *"extreme impairment" in concentration persistence or pace*. She explains that although he seemed able to maintain concentration and that she was "impressed by his persistence," Mr. Moon's "work speed fell far below the level needed for competitive employment in all areas." [79] The doctor admitted "no problems with concentration were apparent in this examination," but cautioned that "individuals with diabetes do experience fluctuations in mood and application during the day. This is particularly true when diabetes is poorly controlled."[80]

### Hearing Testimony

Plaintiff reported he last had trouble with his vision one week prior to the hearing.[81]  He reported he took medication for diabetes and allergies and experienced no side effects.[82]  When asked at the hearing how often his leg pain bothered him, Mr. Moon answered, "Almost every day."  He clarified that his legs were not bothering him as he sat at the hearing:  "It's only when I really walk around and sit around and especially at night it hurts . . . ." Regarding his arm pain, "They're not too good. They cramp up any time they want. . . .  Both [arms]. . . almost all the

---

[78] *Id.* (emphasis added).
[79] R. 230 (emphasis added).
[80] *Id.*
[81] R. 275-76
[82] R. 279.

time. . . .  Nothing you can do about it, just cramps, cramps up when I -just like a little cold hits it . . . .,,[83]

He said the previous morning, he arose at between five and six a.m., relaxed and watched movies on his VCR all day because of leg pain.[84]  He said he sleeps

> maybe about five hours, four hours . . . .  I'm tired, but I just can't -- where you just can't close your eyes and - because of the . . . pain is shooting into your legs, your arms and your back . . . . I can't lay a certain ways on my back, can't lay flat. I'll lay sideways . . . then my legs will start hurting because they get cold and then when the cold hits your legs . . . like somebody was pouring ice water on there . . . but the rest of the leg would be hot and I - or cramp up.[85]

Mr. Moon stated that the lack of sleep made him "kind of burned out in the day,"[86] though he was wide awake in the mornings.[87]

Plaintiff testified that he had a driver's license, drove 40 minutes to his employment counselor's office the morning of the hearing, and drove off and on, but had problems seeing the road and getting lost or drowsy and always wore sunglasses.[88]  Plaintiff testified he lived with his father and mother, and his children.[89]  He said he and his children took care of themselves, and he was capable of preparing meals, driving, doing laundry with instruction and physical assistance, and shopping.[90]  Mr. Moon testified that he has "about two good days" a week where he could go outside and rake leaves for "maybe about an hour, but I try to get it done fast before my legs and stuff start cramping up."[91]

---

[83] R. 283.
[84] R. 280-81.
[85] R. 291.
[86] R. 292.
[87] R. 291.
[88] R. 252, 255-56, 284, 287, 292-93.
[89] R. 253-54.
[90] R. 254, 284, 287-89.
[91] R. 289-290.

Plaintiff demonstrated the ability to see, hear, speak, read simple words, and perform addition, subtraction, division, and multiplication.[92]  He said he could use a TV Guide and count and make sure he received proper change.[93]  Plaintiff testified he could not work because he worked too slowly, could not complete paperwork, and could not handle changing work environments or lifting due to almost constant cramping and numbness in his hands, arms, and legs, and to low back numbness.[94]  He said he slept only four or five hours per night due to discomfort.[95]  He said he could lift about 5 or 10 pounds, stand about 30 minutes, sit about 30 minutes, and use his hands for fingering, grasping, and handling.[96]  Plaintiff testified he raised his children to he independent and to cook for themselves, and had no problems with raising them.[97]

Joann Wetzel, Plaintiff's employment counselor, testified about her efforts over several years to find work for Plaintiff and shepherd him through the process of applying for Social Security benefits and getting medical treatment.[98]  She said she drove him to the hearing because she wanted to make sure he attended.[99]

Dina J. Galli testified at the administrative hearing as a vocational expert.[100] The ALJ asked Ms. Galli to consider a hypothetical person of Plaintiff's age, education, and work experience, who had the following residual functional capacity:

---

[92] R. 257-59.
[93] R. 263.
[94] R. 269-72, 283, 290, 293.
[95] R. 291.
[96] R. 272-73, 286, 287.
[97] R. 274.
[98] R. 294-300.
[99] R. 300.
[100] R. 302-07-testimony; R. 64-resume.

no repetitive lifting of more than 5 to 10 pounds at a time;

lifting or carrying items weighing 3 to 5 pounds on an occasional basis;

no standing or walking more than 30 to 60 minutes at a time or more than 2 to 3 hours in an 8-hour workday;

no sitting more than 30 to 45 minutes at a time or more than 5 to 6 hours in an 8-hour workday;

no repetitive stooping, bending, or squatting;

no kneeling, crawling, crouching, or stair climbing;

no working in other than a clean climate controlled environment;

no working around dangerous unprotected heights, machinery, or chemicals;

no work at more than low-stress levels, meaning a low production rate, only occasional interaction with the general public, and minimal work-setting changes (meaning the same work over and over, day in and day out);

no work at more than low-concentration levels, precluding mental computation tasks, sustained spontaneous speaking, sustained writing and reading, but still having alertness and attentiveness;

no work at more than low-memory levels, meaning able to understand, remember, and carry out simple one and two-step instructions with General Educational Development (GED) reasoning level of one to three, GED math level of one to two, and GED language level of one to three;

the option to use memory aids and a calculator for difficult calculations;

only minimal changes in work instructions from week to week; and

no work requiring fine vision and which would not allow him to speak up or ask others to speak up.[101]

Ms. Galli responded that such an individual could perform unskilled work as a

final assembler (US. Dep't of Labor, Dictionary ofOccupationa1 Titles (4th ed. 1991) (DOT) # 713.687-018) (20,000 jobs nationally);
dowel inspector (DOT # 669.687-014) (15,000 jobs nationally);

---

[101] R. 22, R. 302-03.

paramutual ticket checker (DOT # 237.367-046) (32,000 jobs nationally);
nut sorter (DOT #521.687-086) (30,000 jobs nationally); and
cutter and paster (DOT #249.387-014) (30,000 jobs nationally).[102]

She reduced the numbers of these jobs by 25% with the added limitations of a need to use sunglasses to reduce eye strain and a need to make postural changes every 15 to 20 minutes.[103]

Ms. Galli further indicated that if the Plaintiff had significant problems cognitively, was unable to handle the repetitive tasks over the long term, made mistakes, lost concentration and focus so that his production was reduced 25% below average, he could not be employed.[104] Further, if he were absent due to significant pain in the extremities and limbs only three or four days a month, he would not be employed.[105]  Finally, if he had an extreme limitation in concentration, persistence or pace, he could not be employed.[106]

### Framework for Analysis

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[107]  The Act further provides that an individual shall be determined to be disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[102] R. 304-06.
[103] R. 306.
[104] R. 306-07.
[105] R. 307.
[106] *Id.*
[107] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."[108]

A person seeking Social Security benefits bears the burden of proving that because of his disability, he is unable to perform his prior work activity.[109]  Once the claimant establishes that he has such a disability, the burden shifts to the Commissioner to prove that the claimant retains the ability to do other work and that jobs which he can perform exist in the national economy.[110]

The Commissioner's decision must be supported by substantial evidence.[111]  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[112]  Evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.[113]

The Commissioner's findings of fact, if supported by substantial evidence, are conclusive upon judicial review.[114]  In reviewing the Commissioner's decision, the court may not reweigh the evidence or substitute its judgment for that of the agency.[115]  However, the court should

---

[108] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[109] *Miller v. Chate*r, 99 F.3d 972, 975 (10th Cir. 1996); *Nielson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993); *Andrade v. Secretary of HHS*, 985 F.2d 1045, 1050 (10th Cir. 1993).

[110] *Saleem v. Chate*r, 86 F.3d 176, 178 (10th Cir. 1996); *Miller*, 99 F.3d at 975; *Nielson*, 992 F.2d at 1120.

[111] *Daniels v. Apfel*, 154 F.3d 1129, 1132 (10th Cir. 1998); *Hinkle v. Apfel*, 132 F.3d 1349, 1351 (10th Cir. 1997); *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997).

[112] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Hinkle*, 132 F.3d at 1351; *Brown v. Callahan*, 120 F.3d 1133, 1135 (10th Cir. 1997).

[113] *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991).

[114] 42 U.S.C. §§ 405(g), 1383(c)(3); *Perales*, 402 U.S. at 390.

[115] *Hinkle*, 132 F.3d at 1351; *Decker v. Chater*, 86 F.3d 953, 954 (10th Cir. 1996); *Marshall v. Chater*, 75 F.3d 1421, 1425 (10th Cir. 1996); *Kelley v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995).

carefully examine the record and review it in its entirety.[116]  Failure of the Commissioner to

apply the correct legal standard is grounds for reversal.[117]

The Commissioner has established the following five-step process for determining

whether a person is disabled:

(1)    A person who is working is not disabled.[118]

(2)    A person who does not have an impairment or combination of
impairments severe enough to limit his ability to do basic work activities
is not disabled.[119]

(3)    A person whose impairment meets or equals one of the impairments listed
in the "Listing of Impairments"[120] is conclusively presumed to be
disabled.[121]

(4)    A person who is able to perform work he has done in the past is not
disabled.[122]

(5)    A person whose impairment precludes performance of past work is
disabled unless the Secretary demonstrates that the person can perform
other work available in the national economy.  Factors to be considered
are age, education, past work experience, and residual functional
capacity.[123]

The ALJ followed the five-step sequential evaluation process to determine that Plaintiff

was not disabled.  At the first step, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since July 1, 2001.[124]  At the second step, the ALJ found that Plaintiff had the

following "severe" impairments:  learning disability, borderline IQ, and diabetes.[125]  At step

three, the ALJ found that Plaintiff's severe impairments did not meet or equal any of the

---

[116] *Musgrave*, 966 F.2d at 1374; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).
[117] *Daniels*, 154 F.3d at 1132; *Hinkle*, 132 F.3d at 1351; *Hawkins*, 113 F.3d at 1164; *Winfrey v. Chate*r, 92 F.3d
1017, 1019 (10th Cir. 1996).
[118] 20 C.F.R. § 416.920(b).
[119] 20 C.F.R. § 416.920(c).
[120] 20 C.F.R. pt. 404, subpt. P, app. 1.
[121] 20 C.F.R. § 416.920(d).
[122] 20 C.F.R. § 416.920(e).
[123] 20 C.F.R. § 416.920(f), *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).
[124] R. 16, 24 (Finding 1).
[125] R. 16, 24 (Finding 2).

Listings.[126]  While he found Plaintiff "suffers from a learning disorder,"[127] the ALJ found that Plaintiff did not suffer from any marked limitation in activities of daily living; maintaining social contact; or concentration, persistence or pace and that the claimant never exhibited an episode of decompensation of extended duration.[128]  At the fourth step of the evaluation, the ALJ assessed Plaintiff's residual functional capacity and found he could perform a range of unskilled, sedentary work.[129]  At the fifth step the ALJ determined that work existed in the national economy at the unskilled, sedentary level, which plaintiff could perform.

### Plaintiff's Arguments

Plaintiff alleges that the ALJ should have found Plaintiff disabled at Step 3, under Listings 12.05 C or D.

### Deficiency in Findings

Plaintiff claims that the ALJ violated the rule of *Clifton v. Chater*[130] requiring that specific findings accompany any Step 3 conclusions because "the ALJ does not set forth any underlying evidence, but only recites bare conclusions that Mr. Moon does not meet or equal any of the relevant Listings.[131]  But the section of the adverse decision on Step Three clearly points the reader to the factual analysis in Step Four.  "Support for these conclusions [on Step 3] is noted hereafter in the description of medical evidence and the discussion of the testimony which reflects the nature and severity of the claimant's impairment and resulting

---

[126] R. 17, 24 (Finding 4).
[127] R. 17.
[128] *Id.*
[129] R. 22, 24 (Finding 6).
[130] 79 F.3d 1007, 1009 (10th Cir. 1996).  *See also Smith v. Barnhart*, No. 04-7027, 2006 WL 467958, *4 (10th Cir. February 28, 2006)(unpublished decision) in which "the ALJ failed to mention what specific listing(s) the ALJ considered and failed to discuss why Mr. Smith did not meet any listing(s)."
[131] Reply Brief at 1-2, filed August 10, 2005, as docket no. 15.

limitations.[132]  In that later discussion, the ALJ reviews the hearing testimony and the

medical history, discussing in detail all the facts the ALJ relied on in finding the residual

functional capacity (RFC) that was applied, while considering the functional limitations

criteria under the Listings.  This is consistent with the regulations which note the

interrelationship between the functional limitations and RFC.[133]  As noted below, the ALJ

carefully discusses his findings and their departure from Dr. Gummow's conclusions.

It is true that the ALJ did not discuss the specific criteria applicable to Listings 12.05

C and D, and under those criteria did not discuss the evidence supporting his conclusions, but

the decision does contain factual analysis reflecting the basis for his decision on Step 3.  It

would have been better to include the discussion in the Step 3 conclusions, but there is

sufficient detail and relation to support the conclusions.  "An ALJ's findings at other steps of

the sequential process may provide a proper basis for upholding a step three conclusion . . . ."[134]

**Legal Error**

Plaintiff points out that as to Listing 12.05, the ALJ was in error in requiring that "the

claimant establish at least two of the . . . (functional limitation) requirements."[135]  There are

four alternative ways to satisfy Listing 12.05, and only one of them requires that any "B"

criteria describing functional limitations be satisfied.[136]  This error is without consequence in

---

[132] R.17.
[133] "An assessment of your RFC complements the functional evaluation necessary for paragraphs B and C of the listings."  20 CFR § 404, subpt. P, app. 1, 12.00 Mental Disorders, A.
[134] *Fischer-Ross v. Barnhart*, 431 F3d. 729, 733 (10th Cir. 2005).
[135] Plaintiff's Memorandum . . . at 11, filed May 31, 2005, as docket no. 9.  *See* R. 17.
[136] "Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings."  20 C.F.R. pt. 404, subpt. P, app. 1, 12.00 Mental Disorders, A.

the outcome, however, because all the listing possibilities for mental retardation under 12.05 require "deficits in adaptive functioning." [137]

## Listing 12.05 C

Plaintiff claims that he should have been found to satisfy Listing 12.05 C, which requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22;"[138] *and* "valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function."[139]

Plaintiff had three reported IQ tests:

verbal IQ of **67**, a performance IQ of 80, and a full-scale IQ of 81 (June 27, 2001, Dr. McGil, R. 131):

full-scale IQ of **71** (March 22, 2002, Jonathan J. Ririe, . Ph.D., Tr. 136) (also relied on in an April 14, 2002, review by Rebecca Dalisay, M.D. R. 155-168)): and

full scale IQ of **64**:  (September 6, 2003, Linda J. Gummow. Ph.D., R. 225).

Plaintiff claims the ALJ should have used the lowest IQ score, generated by Dr. Gummow, citing this authority:

---

[137] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.05 Mental Retardation.  "If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00 Mental Disorders, A.  After amendments to the regulations effective during the pendency of this case, "it is now clear that the capsule definition ["significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period"] imposes additional elements to the claimant's burden under Listing 12.05(C) and (D). *Barnes v. Barnhart*, No. 02-5153, 116 Fed.Appx. 934, 939 (10th Cir. November 26, 2004).
[138] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.05 Mental Retardation.  "If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00 Mental Disorders, A.
[139] *Id.*, 12.05 C (emphasis added).

> In cases where more than one IQ is customarily derived from the test
> administered, e.g., where verbal, performance, and full scale IQs are provided in
> the Wechsler series, we use the lowest of these in conjunction with 12.05.[140]

However, this authority deals with a test such as that administered by Dr. McGil which had

multiple components.  The regulation does not require that the lowest test score from separate

tests be used; only that the lowest score be used from a single test yielding multiple scores.

The importance of selection of the lowest IQ test is diminished because regulations state

that IQ tests "are only part of the overall assessment" and require the narrative report that

accompanies the test results to "comment on . . . the developmental history and the degree of

functional limitation."[141]   Under 12.05 C, functional limitations of the "B" Criteria are not

pertinent, but the listing still requires "significantly subaverage general intellectual functioning

with deficits in adaptive functioning."[142]  In his findings on RFC, the ALJ specifically

discussed Plaintiff's functional limitations.  As will be discussed, the ALJ's conclusions on

the absence of functional limitations caused him to find Dr. Gummow's report less

persuasive.

### Dr. Gummow's Report

Plaintiff feels, however, that Dr. Gummow's report should be *preferred* over the other

reports.  The first reason Plaintiff says Dr. Gummow should be preferred is because Dr.

Gummow's credentials are better than those of the other doctors.  "Because Dr. Gummow is an

experienced specialist in the field of neuroscience and has provided the only comprehensive

---

[140] *Id.*, 12.00D.6.c.
[141] *Id.*, 12.00D.6.a.
[142] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.05 Mental Retardation.  "If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing."  20 C.F.R. pt. 404, subpt. P, app. 1, 12.00 Mental Disorders, A.

neuropsychological evaluation of Mr. Moon, the ALJ and Commissioner err in devaluing her opinion."[143]  Plaintiff asserts that a regulation requires this result.  "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."[144]  However, in this case, the ALJ deliberately departed from the general rule after careful explanation of each point of disagreement, illustrating the way the ALJ methodically weighed the evidence:

> [Dr. Gummow] reported the claimant was able to understand task instructions and that his *ability to concentrate* was adequate which is inconsistent with her conclusion that the claimant has marked impairment in adaptation and extreme impairment in concentration, persistence and pace. . . .  Dr. Ririe reported the claimant's comprehension appeared to be within normal limits.  Dr. Gummow indicated his *activities of daily living* were markedly impaired which is inconsistent with the claimant's report to her that he can drive, shop, tend to his personal needs do some cooking, cleaning and yard work, and care for his young children.  Dr. Gummow further indicated the claimant had a moderate impairment in *social skills*, however, the claimant has reported he had no problems getting along with others and Dr. Ririe reported the claimant had no difficulty interacting with him.  *Dr. Gummow's opinion does not clinically correlate* with level of functioning described in the other evidence of record, statements/testimony of the claimant and observations of the ALJ during the hearing.  Accordingly, her opinion is rendered less persuasive.[145]

Since the ALJ's decision clearly states the reasons for departing from Dr. Gummow's conclusions, the decision should not be disturbed by a re-weighing of the evidence.  The ALJ's decision does not show, as Plaintiff asserts, that the ALJ failed in his duty to resolve conflicts in the evidence or that he used evidence selectively to bolster his opinion.[146]

---

[143] Reply at 4.
[144] 20 C.F.R. § 416.927(d)(5) cited in Plaintiff's Memorandum at 15.
[145] R. 21 (emphasis added).
[146] Plaintiff's Memorandum at 17 (citing *Casias v. Secretary of Health & Human Services*, 933 F.2d 799 (10th Cir. 1991) and *Richardson v. Perales*, 402 U.S. 389, 399.(1971)).

Plaintiff also believes Dr. Gummow should be preferred "[b]ecause Mr. Moon has undergone only one comprehensive neuropsychological evaluation."[147]  Dr. Gummow's testing was more complete than any other testing.

Plaintiff is asking the court to consider that Dr. Gummow is a specialist, administered more tests than other examiners, and examined Plaintiff more recently than any other examiner, and then overturn the ALJ's reliance on other examiners.  This is an enticing invitation, given the contrast between Dr. Gummow's in person, extensive examination, and Dr. Ririe's PRT and RFC evaluations made on the basis of paper submissions.  But the clear explanations by the ALJ protect his decision from second-guessing by the court.

### Listing 12.05 D

The required deference to the ALJ's fact weighing is also determinative of Plaintiff's claim that he is disabled under 12.05 D.  That listing requires that a claimant meet two of the four functional limitations of the "B" criteria to be considered disabled.

> D.      A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.[148]

While Dr Gummow found that Plaintiff has a marked impairment in activities of daily living and in adaptation and an extreme impairment in concentration, persistence or pace, Rebecca Dalisay, M.D. found only mild or moderate restrictions.[149]

---

[147] Plaintiff's Memorandum at 15.
[148] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.05 D.

### Summary of Step 3 Analysis

Plaintiff claims "[i]t is improper for the ALJ to substitute his own opinion for that of a competent and experienced neuropsychologist after extensive standardized testing and clinical observation."[150]  But the ALJ did not *substitute* his own opinion; he used his observations in the hearing to determine which medical opinions were most persuasive.  The ALJ carefully noted that "no treating or examining physician has indicated the claimant is precluded from all types of work activity and the claimant reported he only filed for disability because his social worker told him to."[151]  It was also significant to the ALJ that "Dr. Gummow even indicated some form of manual labor was . . . open to the claimant."[152]

While the section of the decision discussing Step 3 does not include specific findings but only references the factual discussion in another portion of the decision, it is clear the ALJ did not agree that the Plaintiff met *any* of the criteria under 12.05 C:

> "significantly subaverage general intellectual functioning with deficits in adaptive functioning;"[153]

> "valid verbal, performance, or full scale IQ of 60 through 70;"[154] *and*

> physical or other mental impairment imposing an additional and significant work-related limitation of function."[155]

---

[149] Psychiatric Review Technique form R. 155-168.  *See also* Dr. Dalisay's Residual Functional Capacity Form R. 173-175.

[150] *Id.* at 16.

[151] R. 21-22.

[152] R. 22.

[153] 20 C.F.R. pt. 404, subpt. P, app. 1, 12.05 Mental Retardation.  "If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00 Mental Disorders, A.

[154] *Id.*, 12.05 C (emphasis added).

[155] *Id.*

Further, the ALJ expressly found that the functional limitations of the "B" criteria, required for Listing 12.05 D were not met.

"Had we been the fact finder, we may well have reached a different conclusion concerning the weight to be given,"[156] but there is substantial evidence to support the conclusions reached.  The record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[157]  The evidence relied on by the ALJ is not overwhelmed by other evidence and the ALJ was not merely stating conclusions.[158]

Plaintiff even asks that the ALJ's questions and answers be re-evaluated because the ALJ failed to see that Mr. Moon was merely mimicking the questions, not actually responding to them.

> Mr. Moon's testimony also makes obvious the easy suggestibility to which he is vulnerable- at times displaying a rote repetition of the ALJ's suggested testimony to him, with the ALJ later reiterating his own words in his Decision, rather than those of Mr. Moon's.  For example, the ALJ suggested to Mr. Moon that he was a "safe driver"; Mr. Moon nods along with the suggestion, agreeing that he was "safe," and adding with his difficult semi-slurred speech that he "wore his seatbelts and everything."  The ALJ later finds in his decision, "He said he is a safe driver  . . . ."[159]

Plaintiff says "Mr. Moon's own difficult testimony, his slow and halting speech, and his obvious problems arriving at suitable words and concepts, belies the ALJ's portrayal of Mr. Moon in his

---

[156] *White v. Barnhart*, 287 F.3d 903, 909 (10th Cir. 2001).

[157] *Richardson v. Perales*, 402 U.S. at 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Hinkle*, 132 F.3d at 1351; *Brown v. Callahan*, 120 F.3d 1133, 1135 (10th Cir. 1997).

[158] *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992); *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991).

[159] Plaintiff's Memorandum at 16-17.

decision."[160]   Again, this is a point of disagreement or difference of interpretation, and does not demonstrate an absence of evidence for the ALJ's conclusion.

**Conclusion**

Plaintiff's claim is similar to that made by Timothy Hinkle. The Tenth Circuit[161] stated that Mr. Hinkle (who indisputably had an IQ of 68) had a significant impairment sufficient to pass Step Two.  But Mr. Hinkle's back problems – which restricted heavy lifting and gave him "a poor tolerance for bending and lifting"[162] were not a severe impairment under 12.05 C. Therefore, he was found not disabled under that listing.

It may be that another conclusion could have been reached on this evidence, and that even more substantial evidence would exist to support that decision than the decision of the ALJ. But a court "may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome."[163]  Substantial evidence exists to support the decision made and it will not be disturbed.  The decision of the Commissioner is AFFIRMED.

Dated this 29th day of March, 2006.

BY THE COURT

David Nuffer
United States Magistrate Judge

---

[160] Plaintiff's Memorandum at 16.
[161] *Hinkle v. Apfel*, 132 F.3d 1349 (10th Cir. 1997).
[162] *Id.* at 1353.
[163] *Warburton v. Apfel*,188 F.3d 1047, 1050 (8th Cir. 1999).